*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1391**

State of Minnesota,
Respondent,

vs.

Will Scott,
Appellant.

**Filed February 23, 2015
Affirmed
Larkin, Judge**

Hennepin County District Court
File No. 27-CR-12-11958

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County
Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Chelsie Willett, Assistant Public
Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and

Larkin, Judge.

**LARKIN**, Judge

Appellant challenges the district court's revocation of his felony probation for driving while impaired. He argues that the state did not prove by clear-and-convincing evidence that his violations were intentional or inexcusable or that the need for his confinement outweighs the policies favoring continued probation. We affirm.

**FACTS**

On June 18, 2012, appellant Will Scott pleaded guilty to felony first-degree driving while impaired (DWI). At an August 8 sentencing hearing, the district court stayed execution of a 48-month prison sentence and placed Scott on probation for three years. The conditions of probation included that Scott abstain from alcohol use, complete a chemical-dependency treatment program, cooperate with random chemical testing to document abstinence, and follow all instructions of probation.

On October 17, the probation department filed a probation-violation report and summons, alleging that Scott failed to meet with probation as directed, failed to submit to random chemical testing, and failed to verify employment. At a November 2 hearing, the district court ordered Scott to submit to a urine test and scheduled another court date. After the hearing, Scott refused to submit to the court-ordered urine test and absconded. The district court issued a bench warrant. Later, Scott appeared before the district court in custody, waived his right to contest the allegations, and admitted to the probation violations. The district court imposed an intermediate sanction of 20 days in jail and continued probation.

On August 26, 2013, the district court issued another order for Scott's arrest and detention based on a probation report alleging that Scott had failed to abstain from alcohol use and failed to verify completion of a chemical-health assessment. Scott admitted that he violated a condition of his probation by failing to complete a chemical-health assessment. The district court ordered Scott to serve 365 days in the workhouse for his admitted violation and ordered him to complete the Telesis treatment program while in custody.

On March 14, 2014, the district court once again issued an order for Scott's arrest and detention, based on allegations that Scott had failed to maintain contact with probation, failed to abstain from alcohol use, and failed to comply with random testing. The district court held a contested probation-violation hearing, at which it heard testimony from Hennepin County probation officer Kaitlyn Perfetti, Scott's girlfriend Analicia Martinez, and Scott.

Perfetti testified that after the August 26, 2013 probation violation, Scott successfully completed Telesis at the workhouse but was sanctioned by the workhouse on one occasion for returning from work release intoxicated. Perfetti testified that Scott was released on furlough from the workhouse on January 28 and that probation had no contact with him since that time. Perfetti explained that because "Scott ha[d] not been in contact with probation, we have not been able to have him randomly tested." On cross-examination, Perfetti acknowledged that she did not supervise Scott, that Anoka County probation supervised Scott, and that she based her testimony on notes prepared by Scott's Anoka County probation officer.

Perfetti also referred to two police reports, dated February 22 and April 20, 2014. She testified that the first report alleged that a child called the police to report that Scott had assaulted Martinez and that Scott had been drinking alcohol. Perfetti testified that the other report alleged that Scott "was banging on the door [and was] also intoxicated." After the prosecutor offered the first police report as an exhibit, Scott objected. The district court sustained the objection.

Martinez testified that she and her three children lived with Scott and that she called the police on April 20 because she was intoxicated and angry at Scott. She acknowledged that she told the police that Scott had been drinking and was knocking at the door. But she testified that she had lied to the police and that Scott had not been drinking. Regarding the February 22 incident, Martinez acknowledged that her son called the police but claimed that she had been the only one drinking. She testified that she and Scott had a verbal dispute and that she threw a glass. Martinez further testified that it had likely been over a year since she had seen Scott consume alcohol.

Scott testified that before he was released from the workhouse, he provided his address and phone number to the Telesis counselors. Scott testified that the counselors told him "they were having problems with the paperwork between Anoka and Hennepin" and that nobody was sure which county was going to supervise him. Scott testified that the Telesis counselors therefore told him that upon his release, he should continue his aftercare and that somebody from probation would be in touch with him. Scott acknowledged that he did not contact the probation department in either Anoka or Hennepin after his release but explained that he "was under the impression that they

4

would get in touch with [him] because that's how it's been done in the past, and [he] was just busy with treatment."

The district court ruled on the record as follows:

> I do believe in this case that the state has proven under the *Austin* factors, number one, that your violation was intentional. That you failed to maintain contact with probation. If this were the first time that that allegation had been raised, I might feel differently, but it is the third time. And after the two previous times it should have been clear to you, and I think it was clear to you, that you needed to maintain contact with probation. Your failure to do that leads to my finding in the other respect that you have failed to cooperate with providing testing.
>
> So I find two violations. I find that they are—that they were intentional, that they are inexcusable. Because of the— there is a presumption in favor of continuing you on probation. However, that presumption is overcome in this case because of the history of violations and the repeated nature of the same violations.

The district court revoked Scott's probation and executed his 48-month stayed sentence. Scott appeals.

## D E C I S I O N

When revoking probation, the district court must: "(1) designate the specific condition or conditions that were violated; (2) find that the violation was intentional or inexcusable; and (3) find that need for confinement outweighs the policies favoring probation." *State v. Austin*, 295 N.W.2d 246, 250 (Minn. 1980). The district court "has broad discretion in determining if there is sufficient evidence to revoke probation and should be reversed only if there is a clear abuse of that discretion." *Id*. at 249-50.

5

The state has the burden of proving, by clear-and-convincing evidence, that a probationer violated probation. Minn. R. Crim. P. 27.04, subd. 3; *State v. Ornelas*, 675 N.W.2d 74, 79 (Minn. 2004). Scott argues that "the evidence was not clear and convincing that [his] failure to maintain contact was inexcusable." Scott notes that the district court "stated that due to [his] previous probation violations, it was clear that he knew he had to maintain contact, and that the failure to do so was inexcusable." Scott contends that "under normal circumstances that would be sufficient to show that the violation was inexcusable" but "in this case, [he] was misinformed by his workhouse counselors that probation would be contacting him and that they would be forwarding his contact information to probation." Scott further contends that "the record established that there was confusion regarding which agent he was to report to, whether probation would be contacting him and whether probation was provided with his current contact information."

The weakness in Scott's argument is that the only evidence supporting the purported confusion about his probation supervision and misinformation provided by the workhouse counselors was Scott's own testimony. The district court's ruling implies that it did not credit his testimony. This court defers to that implicit credibility determination. *See State v. Spanyard*, 358 N.W.2d 125, 127 (Minn. App. 1984) (stating that the "[district] court did not believe [the probationer's] explanations for failing to return . . . property" and deferring to that determination "[g]iven that the function of the factfinder is to weigh the credibility of witnesses"). The state presented evidence that Scott did not contact probation after his release from the workhouse and that he previously violated his

6

probation for failing to meet with probation.  Because the district court did not credit Scott's explanation for his failure to contact probation, the record supports the district court's finding that Scott's violation was inexcusable.

Scott also argues that the state failed to meet its burden of proving that the need for confinement outweighs the policies favoring probation.  In assessing this factor, courts should consider whether "confinement is necessary to protect the public from further criminal activity by the offender," "the offender is in need of correctional treatment which can most effectively be provided if he is confined," or "it would unduly depreciate the seriousness of the violation if probation were not revoked."  *Austin*, 295 N.W.2d at 251.  "The decision to revoke cannot be a reflexive reaction to an accumulation of technical violations but requires a showing that the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity."  *Id.* (quotation omitted).

Scott contends that the "record did not show that confinement was necessary to protect the public from further criminal activity," "[t]he evidence that was presented . . . did not conclusively show that [he] did not have the ability to comply with the rules of probation," and "the state made no argument regarding whether reinstatement on probation would unduly depreciate the seriousness of the violation."

Contrary to Scott's assertions, the record in this case shows that confinement was necessary to protect the public, that Scott repeatedly failed to comply with the rules of probation, and that his reinstatement on probation would unduly depreciate the seriousness of the violation.  Scott was placed on probation after his conviction of first-

7

degree DWI, an offense based on alcohol use. In less than a year, Scott violated probation by failing to meet with probation and by failing to submit to chemical testing. Less than a year later, Scott violated probation by failing to obtain a chemical-health assessment. While at the workhouse for his second probation violation, Scott returned from work release intoxicated. After his release from the workhouse, Scott once again failed to maintain contact with probation and failed to submit to chemical testing. Given the underlying offense, Scott's continual refusal to maintain contact with probation and to submit to chemical testing to document abstinence are serious violations that impact public safety. *See id.* (stating that the district court's finding on the third factor should be based on "the original offense and the intervening conduct of the offender"); *Stevens v. Comm'r of Pub. Safety*, 850 N.W.2d 717, 727 (Minn. App. 2014) ("For decades, the harms caused by drunken driving have been a matter of serious concern."); Minn. Sent. Guidelines 3.B (2012) (stating that when considering whether to revoke probation, "[l]ess judicial tolerance is urged for offenders who were convicted of a more severe offense").

In conclusion, the district court's decision to revoke Scott's probation was well within its broad discretion.

**Affirmed.**